Next we'll hear case 3, Koh et al. v. Ustich et al., appeal numbers 18-1809 and 18-1821. The appellant first we'll hear from Mr. Sotos. Thank you, your honors, and may it please the court. I am Jim Sotos. I'll be representing the Northbrook defendants Mark Graff and John Ustich on this appeal. Mr. Alan Wall will be arguing on behalf of the co-defendant, Officer Kim from the Wheeling Police Department. Your honors, the district court erred in denying Mark Graff and John Ustich's motion for summary judgment on grounds of qualified immunity on Mr. Koh's Fifth Amendment claim. Because at no point during the two and a half hour videotaped interrogation, which occurred in two separate sessions, is there a single instance of Detective Graff or Detective Ustich ever saying or doing a single thing that the Supreme Court, this court, or for that matter any other court, has ever held to be unconstitutional. Nor is this a case in which any of the tactics that were utilized by Detective Graff and Ustich during that interrogation were so obviously illegal that no factually analogous case was required. In fact, to the contrary, I would suggest that this court's decision in Gill v. Milwaukee from March of 2017, which was not addressed by the district court, though it was raised by us, compels the conclusion that qualified immunity applies here. In that case, this court granted qualified immunity based on the unsettled state of the law to Milwaukee police officers who allegedly knew of and exploited the plaintiff's intellectual disability by first convincing him to waive his Miranda rights, interrogating him over the course of three days, five hours on one day, six hours on another day, using the same re-techniques that are at issue in this case, including social isolation, confrontation, theme development, minimizing the seriousness of the crime, lying to the plaintiff, suggesting to him that he had been identified as the shooter when he had not, telling him that he had failed a polygraph, and allegedly coercing a false confession from him despite his having professed his innocence on over 140 occasions. We would suggest to the court that that case is virtually indistinguishable from our case. And I would add that in that case, the state court that had heard the trial actually found that confession to be involuntary and suppressed it at the trial. And nonetheless, this court still found qualified immunity. In our case, of course, the state court judge reviewed the videotape, heard the arguments of the prosecution and the defense, heard the testimony of witnesses, and found the videotape interrogation in this case to have been voluntarily given and admitted at a trial, where the jury thereafter acquitted Mr. Coe. What type of interrogation techniques would be so clearly unconstitutional for the police officers would use? Where do you draw that line? I think that there's a pretty good list of instances where the courts have said, these are the things that you can't do, and that that's what police officers understand that they can't do. The most obvious, of course, would be the use of physical violence from Brown versus Mississippi, credible threats of violence, Arizona versus Fulminati, a false promise to set the defendant free, Hadley versus Williams. That was actually an issue in the Dassey case that was argued here, whether or not the police officers had actually done that. Columbia versus Connecticut, a 1961 Supreme Court case prohibited four days of intermittent custodial questioning in conjunction with no Miranda rights being given in the use of a suspect's family as a threat to coercive confession. Rogers versus Richmond is another US Supreme Court case in which there were threats to arrest the suspect's wife, unless he said what the officers wanted him to say. Another example would be Davis versus North Carolina, where a suspect was held for 16 days and interrogated. He was held incommunicado during that time. And of course, we know from the more prominent cases, such as Miranda and its progeny, that there are specific practices and procedures that police officers are told, you cannot do this or you're violating the Constitution. And none of those things occurred here. What this case involved are the Reed techniques. That was in the second interview, right? The Reed techniques, yes, Judge. They were used in the second interview. And I think that the interview slash interrogation in this case can be easily divided into, you know, the first was more of a interview with a couple of instances of confrontation, the first 55 minute interview. And then after the officers had spoken with the NORTAF investigators who were processing the scene, had more evidence that implicated Mr. Reed. What did your officers know when they began the first interview? Well, they didn't know a lot. They knew Detective Eustich had actually been to the scene. And I'm glad you asked that question. He had. He had been to the scene. He had been to the scene. And I'm really glad you asked that question, because the plaintiffs, in stretching the record almost beyond comprehension, took the position that this was reported as a suicide. And there was no reason to think it was anything but that. And that really couldn't be further from the truth. And the district court actually recognized that. Let's get back to, he's at the scene. Was he at the scene while Mr. and Mrs. Coe were still there? They had already been removed to the police department. He got there at roughly 6 o'clock in the morning. The Coes had been at the police department since about 4. I see. And he looked in the door. He saw two pools of blood. The victim at the doorway. He specifically said to the commander who had told him, looks like it may have been a suicide. He said to that commander, well, okay, looks like it'd be kind of hard to do that to yourself, but okay. So at that point, he knew that at the time Mr. and Mrs. Coe were taken to the police station, the commander on the scene did not think it was a murder. That's actually, that's not accurate, Judge, because they, what actually happened there, the plaintiff misquoted the statement from the, that they attribute to, it's the defendant Eisen. And what they state in their statement of facts, and I don't know how they actually can justify this. But what they said was, that Eisen said, it looks like a suicide. But what he actually said, and what's in the record. Who was Eisen? Eisen is a co-defendant in the case who was a commander at the scene. Commander at the scene. Correct. What he actually said was, looks like it's a suicide, but there's a lot of blood. There's some, there's a possibility this may have been a drug house, so we really don't know yet. That was specifically what that commander said. So for the plaintiff to say that the, that Eisen said it was a suicide, and there was no reason to think anything else, just. When Eustich returned, when did Eustich return to the police station before the first interrogation of Mr. Coe began? He did, and he shared with Detective Graff his observations from the scene. So at the beginning of the first interrogation, both Eustich and Graff knew what the folks at the scene knew at that point. Knew what Eustich had seen. There still hadn't been a fuller processing of the scene. I understand that. Yes. That's what I'm getting at. They, that, but they did know that Mr. Coe, in effect, had been arguably arrested and brought in for questioning on the information that the commander at the scene had and had conveyed to Detective Eustich, am I right? When, when, I'm sorry, Your Honor, I didn't. At the beginning of the first interrogation. The first interrogation, correct. The two defendants, your officers. Yes. Did know what the commander at the scene had conveyed to Detective Eustich. Yes, absolutely. Eustich was one of those officers at the beginning of the first interrogation. And you can tell by looking through the first interview that they were exploring a lot of different possibilities. They were asking Mr. Coe, had your son expressed any suicidal ideations? And he said that he had not. Tell me about his friends. Did he have friends? So they were exploring whether there could be other suspects. They asked him at one point, did you have confrontations with him? Did you do this? He never was Mirandized at this point, am I right? He was Mirandized at the very beginning of the interview, and that is on the video. In English. He is Mirandized in English by Detective Graff. And at some point, while he's being Mirandized, Mr. Coe asks for the co-defendant, Mr. Kim, to do the translation. And then he does do the translation. When did Mr. Kim show up? Mr. Kim was there for the beginning of the interview. Okay, and so he asked for a translation of the Miranda warnings. Correct. Was a complete translation of the Miranda warnings in Korean ever given? There was a discussion. What happened there is a matter of dispute. The plaintiff says that he didn't, those Miranda rights weren't fully read, and that's a dispute between the co-defendant, Mr. Kim, and Mr. Coe. What is undisputed is that there was no reason for Detective Graff, when we're looking at a qualified immunity analysis, whether he violated any clearly established constitutional rights. There's no evidence in the record whatsoever that Detective Graff or Detective Ustich had any reason to know that there was any issue between Detective Kim and Mr. Coe about whether or not those rights were being. But the Supreme Court has said in Brown against the United States, that a Miranda warning does not necessarily negate a illegal arrest. And you still have to cope with the possibility that he was illegally arrested. And we certainly accept for purposes of appeal anyway, we won't do this at trial, but we accept for purposes of summary judgment and appeal that he was illegally arrested, that he was under arrest. Therefore, you have to accept the fact that the Miranda warning does not get you a free ticket home. We understand that if in a criminal case, that the giving of the Miranda warnings does not necessarily mean that there was a voluntary confession. We agree with that. Now, on a qualified immunity analysis, where the perspective is supposed to be, which is this where we think the district court went astray. That perspective is supposed to be from the focal point of the officer and what did he know. Not whether or not the plaintiff can demonstrate through an array of facts whether his confession was voluntary. My point is that your officers should have known at that point that the Miranda warning wasn't going to necessarily get them home free in their treatment of Mr. Coe in that first and in the second interview. Again, your honor, no evidence in the record whatsoever that there was any reason for Detective Graff or Detective Eustich to know that. They did what they are supposed to do as police officers. They read those Miranda warnings, and they had gotten an interpreter there because they did know there was a language barrier. And when Mr. Coe asked for the interpretation, they said fine. And then there was an interpretation. Now, we understand there's issues about the interpretation. But that's important, though, about the translation or whatever, whether it really translated. Did he know that he had a right to have an attorney present, or he could remain silent, or did he know all of that? He did. He specifically read those Miranda rights, and he testified in his hearing on his motion to suppress. He said that he told the detectives, I wanted to see my pastor, my friends, my family, and that they told me I only had the right to an attorney. If I may, what if, first of all, continue on Judge Mannion's train of thought with this, how about the over-questioning between the translator and your officers? At times, apparently, they both asked questions simultaneously, gave the man no chance to answer. There were issues about whether more time should have been in. All of these are relevant points to whether or not the confession was voluntary. In fact, it was worked out during, it was all- Well, you said your men did everything they were supposed to, and that doesn't sound like it. How about the medications? They refused the medication. I don't think I went that far, Judge. I didn't say they did everything they were supposed to do. What I said was, this is a two-and-a-half-hour conversation, and that they didn't do anything that had ever been held by a court to be unconstitutional. So, the court brings up the issue of medications, and Mr. Koch says that's the only thing he says occurred off-camera, so we're accepting it for purposes of summary judgment. It seems to be, though, if you have two officers who know this guy was picked up without a warrant and on very shaky and probably no probable cause, and they're going to interrogate him. This isn't the guy you talk over in Badger. It's not the guy that you deny his medications to, and he did it. Well, Judge, with respect to the medications, it is undisputed at this point in the record that he was denied his daily medications, a single dose that he requested them, that he was told he was going to get them, and he didn't get them until the interrogation was over. Again, all relevant to whether- We were told that this interrogation might go on for quite a while. In fact, you better get us some more paper. Wasn't that what he told us the admin person? I think the quote you're referring to, Your Honor, just specifically said, come on, come on, tell us what happened. This could go on for days and days. Yeah, because his lawyer had just shown up. When his lawyer showed up, and Your Honor, I'll answer your question. I want to reserve my time for rebuttal. We'll give you some time for rebuttal. We can finish the question. Okay, certainly. His lawyer showed up, and I think that the officers actually went further than they had to go under the circumstances. He showed up, asked to see Mr. Koh. The lawyer claims he was made to wait for 20 minutes in the station, and that a commander then went and knocked on the door, and this is all on the video. You can see this. Detective Graff went and answered the door. He was told by the commander that his lawyer's here. The commander went out to get the lawyer. Detective Graff resumed the interrogation for three minutes. He ramped up his efforts to try and get Mr. Koh to confess. That's all on the video. And then three minutes later, the lawyer came to the room, was allowed in, and was allowed to stop the interrogation. I think under the law, with respect to the invocation of counsel, they actually did more than they were required to, because I don't think they're required to stop an interrogation until the suspect himself clearly invokes his right to counsel. That's Davis v. U.S., Edwards v. Arizona. That's a very strict rule. And again, I don't want to go too much further, so I can reserve my time. Thank you, Mr. Sotos. We'll give you some rebuttal time. We'll now hear from Mr. Wall. Good morning, Your Honors. And may it please the court, my name is Alan Wall, and I have the privilege of representing the appellant, Police Officer Sung Phil Kim of the Village of Wheeling Police Department. Your Honors, I intend to use five minutes to address the court now so that I can reserve two minutes for rebuttal subsequently. Your Honors, this case comes to the court on an interlocutory appeal from the district court's order denying Officer Kim summary judgment on qualified immunity. Now, the doctrine of qualified immunity, when it's distilled to its essence, is a matter of fairness. And the United States Supreme Court, in 20 of its last 21 qualified immunity decisions, running from Brousseau v. Hagen through District of Columbia v. Westby, has determined that fairness indicated that public officials were entitled to qualified immunity. The fundamental question this qualified immunity review asks is whether clearly established law gave Officer Kim fair notice that his conduct while serving as a Korean language translator during an interview of the plaintiff pursuant to a criminal investigation conducted by Village of Northbrook Police Department detectives could violate the plaintiff's Fifth Amendment right to protection from self-incrimination through a coerced confession. Mr. Wall, we're here on interlocutory appeals. Yes. We're to resolve questions of law. Yes. How is your client's intent on the issue of law? Well, Your Honor, I would say a couple things in that regard. We are here primarily on the issue of the second prong of the qualified immunity analysis, which focuses on whether Officer Kim had, if there was clearly established law that provided him with fair notice regarding his conduct relative to the plaintiff's constitutional rights. With regard to the issue of intent, our argument is that the issue of intent comes up because the district court did not analyze the qualified immunity issues separately and individually for each of the defendants here. But Your Honor, I would also say that, again, we are here on the issue of the second prong of the qualified immunity analysis. I will note that recently this court, in the case of a State of Williams decline, indicated that if this court were confronted with a situation where there was one argument that demonstrated a dispute issue of fact, but other arguments that were presented by the appellant were strictly abstract legal issues of law, the court could retain jurisdiction over those abstract legal issues and proceed with the appeal on that issue. And I would contend here, Your Honor, that certainly the issue of whether the clearly established law existed to give Officer Kim fair notice at the time of this interview slash interrogation, that is the prototypical abstract issue of law that this court absolutely has jurisdiction to take up. And that's your second argument with regard to the clearly established law. And you're folding that into this idea of intent or are you separating the two? No, they're separate, Your Honor, clearly separate. Our second issue is that the district court in its opinion denying Officer Kim qualified immunity, if you look at the case law that was presented and compare that case law with the Supreme Court's standards for determining the existence of clearly established law, you will note that none of the cases  would meet the Supreme Court standard relative to clearly established law that would inform Officer Kim that in his role as the interpreter for Mr. Koh during this interview and then interrogation, none of the case law that is provided comes close to meeting the standards that have been set by the Supreme Court. Would you like to reserve the rest of your time? Yes, Your Honor, I would. Thank you. Thank you, Mr. Wall. We'll now hear from Mr. Drury. Thank you, Your Honors. May it please the court. My name is Scott Drury and I represent the plaintiff in this case, Mr. Koh. I'd like to start out with the issues that are involved in this case. There's the issue of jurisdiction and there's the issue of the merits. Some of the questions that Your Honors asked during the questioning of the Defendant's Counsel went directly to the issue of jurisdiction, specifically the issue of whether or not there are actual fact disputes involved in this case. And we have concessions from the counsel from both defendants that there are, in fact, fact disputes that preclude jurisdiction for this court. The quote from the counsel from the Northbrook defendants was that the issue of Miranda is an issue of dispute. That in and of itself denies this court of jurisdiction. When asking counsel for Defendant Kim about the issue of intent, he conceded that that is an issue of dispute. And as the court found in Stinson, an issue of intent, in fact, is an issue of dispute that denies this court of jurisdiction. As Your Honors know, this is an interlocutory appeal. And on an interlocutory appeal of the denial of qualified immunity, jurisdiction is limited to cases presenting abstract legal issues. And the defendants are required to take the facts in the light most favorable to the plaintiff as well as the reasonable inferences. But the defendants in this case challenge the facts in four ways. First, Your Honors, they ignore the factual disputes and the favorable inferences that go in Mr. Koh's favor. And they present their version of the facts as though they're uncontested. And as Your Honors have already raised, there is the issue of the Miranda warnings. And did Mr. Koh receive his Miranda rights? The Northbrook defendants argue that he received his Miranda rights, that he understood the Miranda rights, and that he knowingly waived those rights. Defendant Kim argues that Mr. Koh knowingly waived his Miranda rights. But what do the facts of this case actually show? The facts of this case show that defendant Graff read Mr. Koh his rights in English, where it was clear from the video and clear from all the evidence and clear from their own actions in bringing defendant Kim into the room to begin with that Mr. Koh did not understand English and that there was a language barrier. And Mr. Koh even said, I need him to transfer, pointing to defendant Kim, meaning that he needed him to translate those rights. And then what does defendant Kim do? He doesn't even provide the real Miranda warnings. He tells Mr. Koh that he doesn't need to have a lawyer. He omits from the Miranda warnings that the statements he makes could be used against him. And what happens after that? Well, then they present Mr. Koh with Miranda warnings in English. And from the video and from the facts on this record, defendant Graff absolutely had reason to believe that Mr. Koh didn't understand what was going on, because as he goes to sign the English Miranda warnings, he says, should I put the time of my son's death? And they stop him from writing. And at that point, they say, no, put the time now. It was clear to everybody in that room. He also said, is it all right if we continue without one, although it was some requirement that he have a lawyer? That's correct. But it was clear, Your Honor, to everybody in the room that Mr. Koh did not knowingly sign that waiver. He didn't know which end was up, is your point? He didn't. And that comes through not just from the Miranda rights, Your Honor, but from other facts and from the other disputes that I'm going to talk about. Another way in which they challenge the facts in this case is that they just omit factual disputes. And one of the factual disputes that they omit, which defense counsel omitted during the argument, is the fact that Mr. Koh actually did invoke his right to counsel. Now, counsel for defendants Graff and Ustich said that there was only one instance where there was chatter off of the video. That's actually incorrect. Mr. Koh testified in his deposition that before they went into the interview room, there was conversation from defendant Graff about whether or not Mr. Koh had a lawyer. And he said he did have a lawyer. And he was not permitted to call that lawyer and wanted to have the lawyer. And then they proceeded with interrogating him. Well, somebody called the lawyer. Ultimately, his family, Your Honor, based on the record, once they realized that their dad and their friend, whose son had just taken his life, had now somehow become a suspect in all of this, they called the lawyer, the same lawyer Mr. Koh would have called, and he showed up. But it wasn't because they allowed Mr. Koh to call the lawyer. Mr. Koh specifically said to defendant Graff, I want to, can I call my pastor? Can I call my kids so I can get my lawyer's number? And he was denied that request, saying the only call that you can make is to your lawyer. Well, he didn't have that phone number with him because he didn't know when he called 911 that morning, after he had found his son in the foyer of the home, that he was going to have to go to the police department with the phone number for his lawyer in case he became a suspect in a murder. He didn't know that. And those facts are all omitted from the defendant's arguments. Was there an autopsy here? Did a coroner pronounce on the cause of death? There was an autopsy here, and Your Honor, I'd have to look and see what the final report of that is. What I do know is that after all the evidence was presented at the jury trial, in merely two hours with a lunch, the jury came back and found that there was no murder by Mr. Koh in this case. And certainly, there was no autopsy at the time that they were interrogating Mr. Koh in that room. As Your Honor's mentioned, the evidence that the defendants had when they brought him into the room was that this looked like a suicide. And the evidence corroborated that as more evidence came in. The theory of defense at the criminal trial was suicide. Is that correct? Correct. Were there alternative theories argued, such as that Mr. Paul Koh was involved in drug use, that it could have been a drug dealer or some other individual? I don't believe that that was the theory at the trial, at the criminal court, Your Honor. It was that this was a suicide. Was there anything about an assisted suicide? I don't believe there was any evidence that this was an assisted suicide. I mean, with the father involved. That's just a curious question. Yeah, there's no evidence in this record that Mr. Koh had anything to do with this death, other than being a loving father. A father who was, I'm sorry, a father who was trying to help his son. That's the evidence of the record. And after he finds his son, this nightmare, horrible situation, the only thing that could have made it worse, if you could make it worse, was to make him a criminal suspect and put him into jail for four years. Those are the facts, Your Honors. Those are the facts of this case. And there are lots of facts that they ignore. They challenge the district court's determinations. They describe the second interrogation as if it was something pleasant. And the fact is, it was not. And I'm sorry, Your Honor. Sorry. Mr. Trey, I wonder if you would return to your jurisdictional issue. You had given us several disputed facts. Are there any others you'd like to invite our attention to? Absolutely. And that's what I was saying, Your Honor, is that they challenge the district court's determinations. And those are factual determinations. Specifically, they challenge the nature of the second interrogation. As I was saying, they challenge, they make it appear in their factual recitation as if this was a mere interview of Mr. Ko, where there was an exchange of ideas, where they were trying to get to the truth. But as Judge Cheng went into in detail in his long and lengthy opinion, this was anything but. Anything but a pleasant conversation between Mr. Ko and the defendants. He found, the district court judge found, that based on the evidence, that this was a coercive interrogation based on physical and psychological intimidation. And finally, Your Honors, the defendants challenge the materiality of all of these facts. But given that we're dealing with Miranda warnings, given that we're dealing with the invocation of the right to counsel, and given that we're dealing with the exploitation of vulnerabilities, someone who didn't understand English, being interrogated in English with an interpreter who sometimes didn't interpret at all, causing Mr. Ko to beg, I need this guy over here to help me. And sometimes misinterpreting what was being said, and sometimes just simply talking over the English interrogator. These facts were all material to the final conclusion here. And if we were to determine that we do not have jurisdiction over this interlocutory appeal, this matter would be tried in the district court. Am I right? That's correct, Your Honor. We would ask on the jurisdictional issue that you dismiss this appeal for lack of jurisdiction and send it back to the district court where we will proceed to trial. And the final thing I'll say on jurisdiction before moving to the merits is that we're not raising jurisdiction as a technicality. There are big policy reasons for requiring that these appeals be solely limited to issues of law, to pure issues of law. Defendants have multiple opportunities to raise the issue of qualified immunity throughout the process. And if we don't strictly enforce the rules, if we don't strictly enforce the requirement that they stipulate to the facts of the case, there's going to be not only a delay in the case and expense to the parties, but there's going to be an inordinate amount of unnecessary work thrust upon the appellate courts, which I think Your Honors are aware of. Turning to the merits of the case, if Your Honors decide to exercise jurisdiction, this court should affirm the district court's denial of qualified immunity because the facts establish that the defendants violated Mr. Coe's clearly established Fifth Amendment right against self-incrimination by coercing his confession. And a lot of the factors that go into this are the same factors that we've already discussed, that I've already discussed. A reasonable officer would have known that he was applying impermissible pressure based on the tactics used in this case. And if you were to ask us to write the decision, which authorities would we rely upon for that proposition? Is there a case or cases? Sure, Your Honor. With respect to the issue of the Miranda warnings, Your Honors could rely on Haines v. Washington that a confession is involuntary in part because there was no evidence the suspect was advised by the authorities of his right to remain silent. Orozco v. Texas also deals with the issue of Miranda. United States v. Sirlin held that there is a presumption of coercion that attend statements given during custodial interrogation in the absence of Miranda warnings. I'd be happy to provide citations for all of these now if you want to hear them or at a later time. With respect to the invocation of the right of counsel, certainly Edwards v. Arizona, that confessions are per se involuntary if elicited through police initiated questioning after a suspect invokes his right to counsel. With respect to exploitation of Mr. Coe's vulnerabilities, and what were those vulnerabilities? He didn't speak English. He was in a room being interrogated and didn't understand what was going on. It's akin to an impairment, whether that impairment is intoxication, whether it's a mental impairment. He did not understand what was going on in that room. And I would ask that your honors look at Cologne v. Connecticut, describing the cardinal convict based... Cologne v. Connecticut, or Mincy v. Arizona, that a confession is involuntary where a suspect was evidently confused and unable to think clearly among other factors. And with respect to the medication, your honors could look at Greenwald v. Wisconsin. The confession was unconstitutionally coerced where among other things, the police denied the suspect his medication. There's no dispute here that he was denied his medication. And there's no dispute here that Defendant Graff absolutely knew the significance of that because the facts show that as he was being taken to the judge, Defendant Graff said to Mr. Coe, don't tell the judge that you're feeling sick. Don't tell the judge that you're feeling dizzy because if you do that, this interrogation, this investigation may go on for another week or two. So he knew what was going on. It was clear to him. And even as they're bringing him to court, they're still threatening Mr. Coe. Again, a father whose son had just lost his life and that was the conduct here. So I do want to talk a little bit about the exploitation of vulnerabilities because the defendants make a big issue about whether or not a reasonable officer would understand that their tactics were impermissible. And I think not giving him his Miranda rights is pretty clear and continuing to question him after he invoked his right to counsel certainly is clear. But the exploitation of vulnerabilities is something that I think deserves particular attention. Again, because it was clear to everybody in the room that Mr. Coe did not understand what was going on. And it was clear to Mr. Kim, Defendant Kim, who consistently says all he was doing was interpreting, that that's not what he was doing. He became an active participant in this interrogation, sometimes asking his own questions, sometimes talking over the interrogator, failing to interpret questions correctly, failing to interpret a Korean idiom correctly. And during a very crucial part of the interrogation where there was a question about whether this was self-defense and Defendant Graf says, were you angry? Defendant Kim asked Mr. Coe, was this in self-defense? It's unclear what question Mr. Coe was answering at that point, but he says yes. And Defendant Kim says, aha, he says it was in self-defense. Anyone. He was speaking in, so some of this in Korean, right? When he's talking to Mr. Coe. Yes, he's asking the questions of Mr. Coe in Korean. So the other interrogators don't know what he's saying. The other interrogators wouldn't know what he was saying, but they certainly would know that they weren't giving enough time to allow the question to sit and have an answer or to ask Defendant Kim, hey, can you not ask questions when we're asking questions? We do this with court reporters all the time at the beginning of depositions. Please, you say to a witness, please don't talk while I'm talking. It's just a common courtesy. So the court reporter can take everything down in something as important as a murder interrogation. The defendant, the Northbrook defendant certainly knew that they wanted to get an accurate record of what was being said and they chose not to do it. They let it become a free for all. Or if there was something as important as, oh, he just said it was in self-defense when everybody was talking at the same time, at a minimum, they knew that they should go back and ask that question again. But they didn't because what the defendants wanted was a confession. They decided what happened. They knew what happened and they were going to get what happened their way no matter what. Because no matter how many times Mr. Koh denied that it happened the way that they were saying it, they kept saying, try again. And they invoked every trick in the book. They invoked God. They invoked his son who had just lost his life. They said, you're going to be here for days and days and days. They kept him incommunicado from his friends, from his family, from his pastor. They absolutely knew what they were doing and any reasonable officer would have known that those tactics were impermissible and coercive. And there's this issue that the defendants raised that none of the cases predate 2009. That's just incorrect. Judge Chang cited cases before 2009. In fact, he cited Haines v. Washington. He cited Anderson v. Therrier which was a 1990 case from this court. He cited United States v. Sublotny, a 1994 case from this circuit. And he also cited a Sixth Circuit case for the language barrier from 1986. But more importantly, our brief which cites a plethora of case law is all before 2009. I think with the exception, Your Honors, of Jackson and Hurt which we don't cite for new propositions but simply that they were reaffirming propositions from these earlier cases. So in this case, the correct level of generality are the tactics that were used. And the tactics have been found to be impermissible even either individually or when looking at the totality of the circumstances. To the extent the defendants are arguing, well, we need a specific case that says a specific thing. That simply is not the case law and it was rejected outright in Hope v. Pelzer, the United States Supreme Court, where they say that officials could be on notice even in a novel situation. We don't think that this case comes close to a novel situation. But even if it did, certainly any of the tactics they used and the combination of those tactics put them on notice that their conduct was unreasonable. A final issue that the defendants raised in their briefs but haven't discussed during their oral argument is the issue of causation. And on that, Your Honors, I would just say that this court doesn't have jurisdiction to address the issue of superseding causation. Certainly, it's not a pure legal issue that's related to qualified immunity as this court recently found in Jackson v. Curry. There's no issue of collateral estoppel as this court found in Sornberger. And if we look at the issue on the merits, the decision of a judge to use evidence does not supersede to break the chain of causation between the police officer misconduct and constitutional harm. Your Honors, we believe that you should find that you have no jurisdiction in this case and dismiss this appeal and return it to the district court. And if I may just make one, and on the merits, if you reach the merits, you should affirm the decision of the district court. Thank you. What was Mr. Koh's bail set at for that four years? Five million dollars. How many bail reduction motions were there? Your Honor, I would have to, I don't know that standing here right now. Thank you for the question. Thank you. Thank you, Your Honor. Mr. Sotos, we took you into your rebuttal time. Let's give you three minutes. Mr. Sotos. Thank you, Your Honors. Initially, with respect to jurisdiction, we went to great pains to accept all of the district court's conclusions. It's in our reply brief at pages four through 10. We accepted all of the district court's conclusions in this case. What we didn't accept were the plaintiff's exaggerations and misrepresentations of the record. They're entitled to reasonable inferences, but that's it. For instance, when they said that the Eisen said at the beginning to Dunham, it looks like a suicide. As I said before, what he actually said was, it looks like a suicide, but we're not sure because there were two big areas of blood. His throat was slashed and supposedly it's a drug house, so we don't know yet. That was the information that the officers had when they went in. With respect to, so the idea of there not being jurisdiction, that's a fabricated issue. We accepted all of the lower court's conclusions. Much of this case turns on the difference between the perspective in a criminal case from a voluntariness perspective, which has to be from the perspective of the individual, and a qualified immunity argument, which is from the perspective of the officers. There is nothing in this record anywhere that suggests that these police officers, who I represent from Northbrook, did anything other than to read him as Miranda rights, and when he said that he wanted the interpreter to help, that he let the interpreter talk to Mr. Coe. That's the entirety of the record, so to suggest there's an issue against graft or usage for what occurred with the Miranda rights, there's no basis for that. With respect to the invocation of counsel, they misrepresented the record again. Mr. Drury said that, Mr. Coe said, I want to call my pastor, my friends, so I can get my lawyer. He didn't say that. There's nothing in the record. He said, I want to call my pastor and my friends, and they told me, all I can do is talk to my lawyer, so I implore the court to look at the record on those two critical issues that he keeps bringing up, invocation of counsel and Miranda, and say there's nothing in this record to suggest that those officers did anything wrong under any governing precedent. And finally, with respect to the idea that these tactics were unconstitutional and gone too far, I would suggest to the court that the re-interrogation tactics have never been held unconstitutional. They have certainly become controversial, as this court stated in the Dassey case. Judge Rovner eloquently explained in her dissent why the law needs to catch up to the technology, which has demonstrated the prevalence of false confessions, and she points out how in England they don't use those kinds of interrogations anymore. But in America, we do. And until the courts or the legislature or somebody tells police officers you can no longer use these coercive interrogation tactics to bring about confessions, it is inappropriate and the qualified immunity is intended to prevent the courts from using Section 1983 damages claims against police officers as a substitute for judicial declarations. So if the courts ever want to say you can't use any of these tactics in combination or individually, they can do that. But this court's already determined in Gill, which I can't figure out why nobody addresses it. We brought it up as a supplemental issue in the district court. It wasn't addressed. Council doesn't address it. It's directly on point. It's about the... Thank you, Mr. Gill. I apologize. Thank you. We'll now hear Mr. Wall for your rebuttal. Your Honor, just a couple of very brief points. The jurisdictional issue from the perspective of Officer Kim should be properly understood as whether Officer Kim's legal argument regarding clearly established law and fair notice, whether those arguments are dependent on disputed facts. And I would submit to Your Honors that Officer Kim has presented a purely legal abstract argument in his briefs. And those arguments are in no way dependent on any disputed issues of fact. Your Honors, with regard to Miranda, Officer Kim was there to serve as Mr. Koh's translator. Miranda rights were given in English. Officer Kim translated all her portions into Korean. There is no clearly established case law that would have indicated to Officer Kim that mistranslation of Miranda rights had been provided in English could have resulted in Officer Kim committing a violation. There is case law that emphasizes the need for accurate translation that wasn't there. Indeed, Your Honor. And you'd have, I mean, if you've got an IQ one half your body temperature, you can read those cases and realize you're not supposed to fudge on it, right? But in this instance, Your Honor, the district court itself indicated that the issue regarding the translation of Miranda went to the question of whether Mr. Koh's confession was voluntary or not. That was the issue the district court focused on. And I would submit to Your Honor that there is no clearly established case law that would have informed Officer Kim that mistranslation of all her portions of Miranda that had already been given in English would have resulted in Officer Kim causing a coerced confession under the law. Even after Mr. Koh's indication that he really didn't understand his response really was rather, well, shall we say, opaque. I don't disagree with that, Your Honor, but I would still contend when we understand the issue of Miranda and Officer Kim as the district court framed it in a footnote in its opinion that it's the issue of whether the confession was voluntary or not, then I think it becomes apparent that there wasn't clearly established case law as of 2009 that would have put Officer Kim on notice beyond dispute that his conduct was volative of Mr. Koh's Fifth Amendment rights. Thank you, Your Honor. Thank you, Mr. Wall. Thank you, Mr. Drury. Thank you, Mr. Sotos. The case will be taken under advisement.